S92A0696. TUTEN et al. v. CITY OF BRUNSWICK et al.
(418 SE2d 367)

WELTNER, Chief Justice.

This appeal concerns the power of a city to alienate a park that has been dedicated to public use.

*Factual background*

1. Residents of the City of Brunswick sought to enjoin the city commission from completing a proposed conveyance to a church of city park land. They contended that:

Blythe Place or Blythe Square was named, designated and dedicated as a public park or square when the original Plan of the City of Brunswick was drawn up and laid out in the year 1771 and has continuously existed as a public park or public square since the existence of the City of Brunswick, Georgia.

The trial court found no material factual issue that would require an evidentiary hearing and disposed of the case on issues of law. The trial court's order states in part:

OCGA Section 36-37-6 establishes a comprehensive method for disposal of municipal property. It requires publication of notice of intent to sell, and a bidding process, for property worth more than $500.00. However, OCGA Section 36-37-6 (c) provides an exception to those procedures, when a city engages in "trading or swapping" property when that is "deemed to be in the best interest of the municipal corporation."

The Court has considered Plaintiffs' thorough analysis of the historical background surrounding the creation of public parks in the City of Brunswick, and their summary of past legislative efforts to protect them. However, the Court finds that under current law the city parks are not exempt from the provisions of OCGA Section 36-37-6 (c).

### Statutory considerations

2. (a) The act of 1976 (Ga. L. 1976, p. 351; enacted as Code Ann. § 69-318; now codified as OCGA § 36-37-6 (a)) provided in part:

Except as otherwise provided in this Code section, the governing authority of any municipal corporation disposing of any real or personal property of such municipal corporation shall make all such sales to the highest responsible bidder, either by sealed bids or by auction after due notice has been given.

(b) The act of 1976, above (now codified as OCGA § 36-37-6 (b) and (c)) also provided in part:

Notwithstanding the foregoing provisions of this section [concerning bidding procedure, notice, advertisement requirements], the governing authority of any municipal corporation is hereby authorized to sell any lots from a municipal cemetery or personal property belonging to the municipal

corporation with an estimated value of $500 or less without regard to the foregoing provisions of this section. Such sales may be made in the open market without advertisement and without the acceptance of bids. The estimation of the value of any personal property to be sold shall be in the sole and absolute discretion of the governing authorities of the municipality or their designated agent. Provided, however, nothing herein shall prevent a municipality from trading or swapping property with another property owner, if said trade or swap is deemed to be in the best interest of the municipality.[1]

3. (a) With the appearance of the Official Code of Georgia Annotated, Code Ann. § 69-318 became OCGA § 36-37-6. It was divided into six subparagraphs (the latter three being unrelated to this appeal). The first subparagraph carried forward existing restrictions upon the disposition of city property (the 1976 act). The second subparagraph continued the 1976 act's authorization of a municipal corporation to sell lots from a municipal cemetery, and to sell personal property belonging to the municipal corporation having an estimated value of $500 or less.[2] The third subparagraph repeated the final sentence of the 1976 act (Division 2 (b), above), altered slightly so as to read:

Nothing in this Code section shall prevent a municipal corporation from trading or swapping property with another property owner if such trade or swap is deemed to be in the best interest of the municipal corporation.

(b) It is on this third subparagraph, now OCGA § 36-37-6 (c), that the city and church place their principal reliance.

*The issue*

4. (a) The problem of statutory construction in this case thus becomes an analysis, not so much of words, but of punctuation and new

---

[1] It is plain that the last sentence authorizes trading and swapping only for the properties identified in the preceding sentences. "Words, like people, are judged by the company they keep. *Noscitur a sociis.* [Cit.] The critical phrase . . . thus must be gauged by the words surrounding it. . . ." *Anderson v. Southeastern Fidelity Ins. Co.*, 251 Ga. 556 (307 SE2d 499) (1983).

[2] The act of 1978 (Ga. L. 1978, pp. 890, 891, amending Code Ann. § 69-318; now codified as OCGA § 36-37-6 (b)) retained the above paragraph, amending it in part as follows: [T]he governing authority of any municipal corporation is hereby authorized to sell personal property belonging to the municipal corporation with an estimated value of $500 or less and lots from any municipal cemetery, regardless of value, without regard to the foregoing provisions of this Section.

subparagraph structures; and of their effect upon existing statutes as rearranged; and upon the common law.[3]

(b) The following precepts are instructive:

(i) OCGA § 1-1-2 provides in part:

Except as otherwise specifically provided by particular provisions of this Code, the enactment of this Code by the General Assembly is *not intended to alter the substantive law in*

---

[3] For many decades, common law principles have restricted severely the alienation of dedicated public lands. Common law authorities include the following:

(a) *Mayor &c. of Macon v. Franklin*, 12 Ga. 239 (1852):

A dedication of land to public use is in the nature of an estoppel *in pais*, and where an attempt is made by the proprietor to revoke it by a sale of the land, he may be enjoined by any person interested in the use. [Id. at 239, hn. 5.]

When a dedication is made by a Town or City, it enures to the benefit of all who are at the time, or may afterwards become citizens of the corporation. [Id. at 239, hn. 6.]

(b) *Kirkland v. Johnson*, 209 Ga. 824 (76 SE2d 396) (1953):

As a general rule, property held by a municipality for governmental or public uses can not be sold without express legislative authority, but must be devoted to the use and purpose for which it was intended. [Id. at 825, hn. 1.]

(c) *Norton v. City of Gainesville*, 211 Ga. 387 (86 SE2d 234) (1955):

There appears from the authorities to be a clear distinction between property purchased by a municipal corporation and held for use by it as an entity, or in its proprietary capacity, and property purchased by the city for the public use and benefit of its citizens. The title and power of disposition of property acquired for strictly corporate purposes and held in its proprietary capacity, are different from its title to property acquired for and dedicated to the public use of its inhabitants. As to the former, the power to dispose is unquestioned, but as to the latter, in the absence of express legislative authority, it is only where the public use has been abandoned or the property has become unsuitable or inadequate for the purpose to which it was dedicated that the city has power to dispose of such property. [Id. at 390.]

(d) *City Council of Augusta v. Newsome*, 211 Ga. 899 (89 SE2d 485) (1955):

"As a general rule, a municipality has no power to convey or sell land dedicated as a public park, square or common." [Cits.] [Id. at 899, hn. 1.] . . .

[T]he only purported abandonment of said property was by resolution of the Mayor and Council of the City of Augusta, adopted after the filing of the petition before the court, in which it was provided that said property is hereby abandoned as a park and shall no longer be used for park purposes and shall be sold to Sears, Roebuck & Company (for private purposes). . . . [Id., hn. 2.]

See also McQuillin, Mun. Corp. § 28.38 (3d ed.) (1990 revised volume):

A municipal corporation cannot sell or dispose of property devoted to a public governmental use or purpose, . . . without special statutory or charter authority, since as to governmental functions the municipality is a mere agent of the state and subject to control by the state legislative authorities. For instance, property may not be sold where it has been acquired or dedicated for public use as a common, or as a park. . . . In this sense all property is public which has been dedicated to public use, or which may be affected by a public trust, either general or special. Municipal corporations hold all property in which the public is interested, such as . . . parks . . . in trust for the use of the public; and, on principle, such trust property can be disposed of by the municipality only in accordance with the terms of the trust, i.e., in the public interest as declared by statute.

*existence on the effective date of this Code.* [Emphasis supplied.][4]

(ii) OCGA § 1-3-1 (a) provides:

In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy. . . .[5]

5. (a) OCGA § 36-34-3 delineates the general powers of municipal corporations. These include the power to accept by gift, to operate, to regulate, to open and close public parks "in the interest of the health and general welfare." The specified general powers do not include the power to alienate lands dedicated to public usage.[6]

(b) What we now have with OCGA is simply a rearrangement of an existing statute into the first three subparagraphs of OCGA § 36-37-6. There is no statement of legislative intent. There is no new law to supplant "the old law"; there is no specified "evil" in the prior statutory scheme; and there is no declaration of "remedy." (OCGA § 1-3-1, at Div. 4 (b) (ii), above.)

(c) In sum, there is no indication that the General Assembly intended by this minor rearrangement to expand the powers of municipalities; or to relieve them of the bidding requirements of the 1976 act (Div. 2 (a), above); or to alter settled principles of the common law

---

[4] See *Whaley v. State*, 260 Ga. 384, 385 (393 SE2d 681) (1990):
As provided in OCGA § 1-1-2, the enactment of the Official Code was intended to resolve conflicts which existed in the law and to repeal those laws which had become obsolete, which had been declared unconstitutional or invalid, or which had been superseded by the enactment of later laws. [Id. at 385.]
In *Stepperson, Inc. v. Long*, 256 Ga. 838, 844 (353 SE2d 461) (1987), we applied this Code section, holding specifically that a statute in question "was obsolete both because of the passage of time and the constitutional principles announced in *Orr v. Orr*, 440 U. S. 268 (99 SC 1102, 59 LE2d 306) (1979)." See also *Porter v. State*, 168 Ga. App. 703 (309 SE2d 919) (1983).
[5] This rule appears in the Code of Georgia of 1861, § 5 (9th). It was applied as recently as *Sizemore v. State*, 262 Ga. 214 (416 SE2d 500) (1992).
[6] Note that Ga. L. 1956, pp. 22-23, once provided:
Any general or local law to the contrary notwithstanding, the State or any municipal corporation, county or other political subdivision thereof, shall have authority to sell, lease, grant, *exchange* or otherwise dispose of *any property or interest therein comprising parks* . . . or other property which has been dedicated to a public use for recreational or park purposes, or has been dedicated to a public use for recreational or park purposes by a private citizen, corporation, or association, and thereafter acquired by the State . . . without regard to whether said public use has been previously abandoned, or that said property has become unsuitable or inadequate for the purpose for which originally dedicated, said disposition to be on such terms and conditions as may be deemed desirable or necessary. Provided, however, that any lease under this Act shall be for a period not to exceed 5 years. [Emphasis supplied.]
This act was repealed by Ga. L. 1958, pp. 116-117.

restricting the alienation of dedicated public lands. Vide note 3, above.

6. Further, to read OCGA § 36-37-6 (c). as a plenary grant of the power of "trading" and "swapping" city property generates logical possibilities that only can be described as bizarre. For example (and bearing in mind the statutory limitations upon the *sale* of city property), a city is prohibited from *selling* $600 worth of scrap iron unless it complies with the bidding requirements of OCGA § 36-37-6 (a). Yet, it could "swap" or "trade" the city hall itself for a goat![7] The sole requisite would be that such an exchange be "deemed in the best interest" of the city.

7. (a) (i) "The construction [of statutes] must square with common sense and sound reasoning." *Blalock v. State*, 166 Ga. 465, 470 (143 SE 426) (1928).

> (ii) In the construction of a statute a court may decline to give a legislative act such construction as will attribute to the General Assembly an intention to pass an act which is not reasonable, or as will defeat the purpose of the proposed legislation. [*Bd. of Trustees v. Christie*, 246 Ga. 553, 554 (272 SE2d 288) (1980).]

(b) (i) The rearrangement into a discrete subparagraph (OCGA § 36-37-6 (c)) of the final sentence of the act of 1976 (Div. 2 (b), above) (OCGA § 36-7-6 (c)) is not so substantive or reliable an expression of legislative intent as to vitiate the bidding requirements of OCGA § 36-37-6 (a); nor to generate a radical inflation of OCGA § 36-37-6 (b) (which permits only the disposition of municipal cemetery lots and of personal property of limited value), to authorize a city to "swap" or "trade" all of its public property. Nor does it serve to abolish long-standing common law precepts.

(ii) The power to swap and trade cemetery lots and personal property of limited value remains just that — and nothing more.

### Holding

Under our interpretation of the effect of OCGA § 36-37-6 (c), we hold that the proposed land exchange between the city and the church is ultra vires. The City of Brunswick lacks the power to dis-

---

[7] See the concurring opinion of then Justice Clarke in *Dept. of Transp. v. City of Atlanta*, 255 Ga. 124 (337 SE2d 327) (1985):

The literal method simply dictates that we not depart from the plain meaning of the language of the statute. The golden rule method would direct that we follow the literal method unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else. [Id. at 137.]

pose of Blythe Square by virtue of that provision, and the proposed exchange should have been enjoined.[8]

*Judgment reversed. All the Justices concur, except Bell, P. J., and Fletcher, J., who dissent.*

FLETCHER, Justice, dissenting.

The Commission of the City of Brunswick adopted a resolution in June 1991 to transfer part of a city park to a church in exchange for church property. The trial court denied a motion by two city residents seeking to enjoin the conveyance. Because OCGA § 36-37-6 (c) grants municipalities the power to trade property when it is in the municipality's best interest, I would affirm.

1. The code provision governing the disposition of municipal property requires any municipality disposing of real property to sell to the highest responsible bidder by sealed bids or auction, "[e]xcept as otherwise provided in this Code section." OCGA § 36-37-6 (a). The remaining subsections (b) through (h) provide exceptions to the general rule set out in subsection (a). Subsection (b) provides exceptions for personal property valued at less than $500 and municipal cemetery lots regardless of value. Subsection (c) deals with the exchange of property:

> Nothing in this Code section shall prevent a municipal corporation from trading or swapping property with another property owner if such trade or swap is deemed to be in the best interest of the municipal corporation.

---

[8] It may be of more than antiquarian interest to note that an act of the General Assembly of 1788 authorized the city commissioners of Brunswick:

to sell at public vendue, at such times and places as they shall think proper, all or any of the vacant lots in the said town (*except such as were originally reserved for the public use*). . . . [Emphasis supplied.] [*Watkins Digest*, 381.]

Additionally, an act of 1796 recited:

*And whereas*, several persons have at sundry times made attempts to run up the commons of the said towns, but have often been defeated, in the caveat courts of the said county, by the exertions of some of the proprietors of the said towns of Brunswick and Frederica: *Be it enacted*, That any person or persons who may attempt to run any part of the said commons or towns of Brunswick and Frederica, under any pretense whatsoever, shall be liable to a fine of five hundred dollars, . . . [*Watkins Digest*, 599.]

The term of the 1796 Act ("run up") has lost its currency. The Oxford English Dictionary offers (among many usages of "run") this: "to allow to run or feed at large, to graze (cattle, sheep, etc.)." *ad. loc.*, 902a. For "run up" it suggests: "to build, erect, set up (a wall, etc.)." *ad. loc.*, 907c. While its exact meaning remains obscure, the term likely involved the diversion of some aspect of public lands to some kind of private use.

By an act of 1797, the General Assembly authorized the sale of a portion of the commons of Brunswick "after three months' public notice in one of the gazettes of Savannah. . . ." *Marbury & Crawford's Digest*, 160.

Since our earliest days, then, it has been the General Assembly that has authorized the sale of municipal park lands.

OCGA § 36-37-6 (c) (1987).[9]

Construing the statutory language, subsection (c) enables municipalities to trade or swap property with another property owner without receiving sealed bids or conducting an auction so long as the exchange is in the best interest of the municipal corporation. The term "best interest of the municipal corporation" means an exchange for property of like or higher value to the municipal corporation.[10] The city commission's minutes approving the exchange indicate that the church property was of equal size and value to the park property. Since the proposed exchange meets the best interest test, the Brunswick City Commission had the power to convey the park property in exchange for the church property.

2. Contrary to the assertions of the majority opinion, the same analysis and result would have been reached under the statute prior to the 1983 recodification of the code. The previous code provision dealing with the sale of municipal property had three paragraphs. Paragraph one provided procedures for the sale of property to the highest bidder after notice of the proposed sale; paragraphs two and three contained exceptions. See Ga. Code Ann. § 69-318 (Harrison 1976). The exceptions for the sale of cemetery lots, personal property valued at less than $500, and trading or swapping of property were contained in the second paragraph. Their position in the same paragraph does not mean that trading or swapping was limited solely to cemetery lots or personal property under $500, as the majority opinion contends. Instead, like OCGA § 36-37-6 (c), the prior statute permitted municipalities to bypass the notice and bid requirements for the sale of property when the city planned to dispose of property by an exchange.

I am authorized to state that Presiding Justice Bell joins in this opinion.

DECIDED JULY 16, 1992 —
RECONSIDERATION DENIED JULY 30, 1992.

*Rountree & Souther, George M. Rountree,* for appellants.

---

[9] Although the common law authorities cited in footnote three of the majority opinion prohibit a municipality from conveying land dedicated as a public park without express legislative authority, OCGA § 36-37-6 provides the necessary legislative authority to a municipal corporation to sell or dispose of property devoted to public use.

[10] Despite the majority opinion's warning of the "bizarre possibility" of a trade of city hall for a goat, such a trade would be an abuse of the city commission's discretion. See OCGA § 36-30-2; see also *Goodman v. City of Atlanta,* 246 Ga. 79, 80 (268 SE2d 663) (1980) (city authorities may not exercise their power in a capricious and arbitrary manner). The requirement that the exchange meet the best interest of the municipality limits the trades that a city may make.

*Eugene Highsmith, Wallace E. Harrell, Lisa S. Godbey*, for appellees.